IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

RONNIE HILL,

    Plaintiff,

vs.                              CASE NO. CV-00-J-1471-S

DUNN CONSTRUCTION COMPANY,
INC.,

    Defendant.

## MEMORANDUM OPINION

Currently pending before the court is the defendant's motion for summary judgment (doc. 10) and evidentiary submissions in support of its motion (doc. 11). The plaintiff submitted a brief in opposition and evidentiary submissions in support thereof[1] (doc. 12), to which the defendant thereafter replied. The court has reviewed the motion, the memoranda of law and the evidentiary submissions.

## I. PROCEDURAL HISTORY

Plaintiff commenced this action by filing a complaint (doc. 1) alleging that the defendant discriminated against him, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the Alabama Worker Compensation laws.[2] Complaint at ¶¶ 1-2. Neither party having requested oral argument, this court considered this motion upon the pleadings, briefs, and evidentiary submissions. Having considered all

---

[1] The plaintiff's brief and evidentiary submissions were not submitted in a timely fashion. However, the court has considered said submissions on their merits in spite of the plaintiff's failure to comply with this court's rules for submitting such documents.

[2] The plaintiff also alleged violations of the Family and Medical Leave Act in Count I of the complaint, which were voluntarily dismissed by him on May 23, 2001 (docs. 13 and 14).



of the foregoing, the court concludes that the motion for summary judgment is due to be **GRANTED** in favor of the defendant and against the plaintiff.

## II. FACTUAL BACKGROUND

In the light most favorable to the plaintiff, the facts of this case are as follows: The plaintiff worked for the defendant as the foreman of a crew which subgraded roads from 1994 until he was fired in 1999.[3] Complaint at ¶ 9-10; plaintiff depo. at 16. On July 9, 1999, the plaintiff left work early, with permission, to meet his lawyer. The defendant asserts it terminated the plaintiff on July 10, 1999 for allowing his crew to leave with him the previous day. A supervisor found the job site abandoned and the work unfinished during the afternoon of July 9, 1999. Gossett depo. at 29. The plaintiff alleges he was really terminated in retaliation for a 1996 Worker's Compensation claim concerning an on the job injury to his back. Complaint at ¶¶ 27-57. Further, the plaintiff alleges his termination was in violation of the ADA. *Id.* at ¶¶ 61-86.

When the plaintiff was released to work after his 1996 back injury, he was able to perform all of his duties.[4] Plaintiff depo. at 45, 50-54. He aggravated this injury and was again taken off work by his doctor on March 9, 1999. *Id.* at 59. He was off work until June

---

[3]While the complaint alleges the plaintiff was hired by defendant in 1993, the plaintiff testified he believed he was hired in 1994. *See* exhibit 14 to plaintiff depo.

[4]The plaintiff was paid disability benefits for the entire time he was off work in 1996. Plaintiff depo. at 37. Additionally, he received a permanent disability rating and continues to receive payments based on this rating. *Id.* at 37-38. The defendant is also responsible for the plaintiff's future medical bills relating to this injury. *Id.* at 39-40.

14, 1999, at which time he was released to work with no restrictions.[5] *Id.* at 24.  The plaintiff's doctor first released him to work four hour shifts in May, 1999 and then eight hour shifts, but the plaintiff did not return to work until he received the unrestricted release.[6] *Id.* at 66-68, 72-75, 90-92; and exhibits 3-6 and 8 to plaintiff depo.; Nichols depo. at 38-40, 43-45.  The plaintiff disputes that he was released to work beyond the eight hour restriction, although he admits that such a restriction does not appear in the final release from his doctor.  Plaintiff depo. at 90-92.  The plaintiff was told to walk by his doctor during the time he was off work in 1999 and therefore walked two miles every day.  *Id.* at 62, 120.

The typical work day for plaintiff was 12-14 hours.  Plaintiff depo. at 48; depo. of Nichols at 33-34.  The plaintiff had four to five people on his crew and could direct them to perform the more strenuous work.  Plaintiff depo. at 49-50.  However, no one on the crew was as qualified as he was to run the motor grader.  *Id.* at 32; Nichols at 48.  Before the plaintiff was taken off work in 1999, he stated that the bouncing of the motor grader would send pains through his back and he had a constant radiation of pain in his hips.  *Id.* at 55.

William Gossett stated during his deposition that if the plaintiff had restrictions, they would have been honored, but that when the plaintiff returned to work, he had no

---

[5]The plaintiff's argument otherwise in his memorandum is simply incorrect.  *See* plaintiff memorandum at 4-6 and plaintiff's work restrictions, submitted as defendant's exhibits 4-6 and 8.  The court notes that the depositions cited in support of the plaintiff's argument do not contain the statements plaintiff attributes to them.

[6]The plaintiff was paid disability benefits for the entire time he was off work.  Plaintiff depo. at 77-87.

3

restrictions. Gossett depo. at 33, 37. Gossett never heard the plaintiff complain his restrictions were not honored. *Id.* at 38. *See also* Nichols depo. at 38-40.[7]

The plaintiff testified he was able to do his job until the day he was fired. Plaintiff depo. at 106, 114. However, he also stated that he went to his supervisors "[a]t different times, a period of a couple of years" and told them he needed a different position due to his back injury. *Id.* at 96, 126. He states he was told he was needed too much in his current position. *Id.* at 96-97. Both of the jobs plaintiff identifies as having requested would have involved additional training as well as promotions for him. *Id.* at 97-101. The plaintiff later admits he never identified a particular position he wanted, but rather stated that at some point in the future, he might like a less strenuous position. *Id.* at 217-218.

Upon his termination, the plaintiff applied for Unemployment Compensation benefits and later Social Security disability benefits. He received Unemployment Compensation with a partial disqualification after he went before an appeals referee.[8] Plaintiff depo. at 125-126; plaintiff exhibit 12. The plaintiff appealed the complete denial of unemployment benefits to the appeals referee, but did not appeal it further. Plaintiff depo. at 251.

In his Social Security application, the plaintiff states the date he became unable to work was July 10, 1999, the date of his termination.[9] Plaintiff depo. at 107, 131-132 and

---

[7]Billy Joe Nichols was the general supervisor for the Northern District the entire time he was employed by defendant. Mark Ratliff was the supervisor over asphalt crews. Plaintiff depo. at 145. Herb Gossett was the safety director. Plaintiff depo. at 146.

[8]*See* § 25-4-78(3)(c), Alabama Code 1975.

[9]In Exhibit 11 to the plaintiff's depo, the Disability Report submitted by defendant to the Social Security Administration, the plaintiff states he became unable to work as of July 15, 1999.

exhibit 9 to plaintiff depo. The plaintiff was found by Social Security to have been disabled as defined by the Social Security Act since July 10, 1999. Plaintiff depo. at 136 and exhibit 10 to plaintiff depo. He agrees with the determination of complete disability. Plaintiff depo. at 138. As of the time of his deposition, the plaintiff was not sure he would be able to reenter the work force at any time in the future. *Id.* at 115. He specifically states he does not think he could do his job with defendant and has held that opinion since about July 15, 1999. *Id.* at 258.

His last day at work, the plaintiff states he had an appointment with his attorney and had asked Nichols to use the extra pickup so he could leave his crew working when he left.[10] Plaintiff depo. at 149. The plaintiff explained:

> Somehow it got twisted around with Larry McAnnally, the truck foreman, supervisor, because he wasn't there at the time I talked to Mike Crane, which was assistant truck foreman. And I asked Mike if he was going to use his truck, because the truck Billy Joe told me to use had to be back at the shop at 6:00 that night for the night crew.
>
> And for the time that I would be at the lawyer's office, get back to Tarrant, I couldn't do it. So I asked Mike Crane if I could use his truck.

Plaintiff depo. at 149-150. The plaintiff had spoken with Nichols about 5:30 or 6:00 that morning while he was at the Tarrant facility. *Id.* at 151. Nichols had specifically told plaintiff to take the Ford Ranger pickup, but plaintiff told him that would not do because of the time frame and asked Nichols if he could use Crane's truck. *Id.* at 154, 213; Crane depo.

---

[10]Each foreman had a truck provided by defendant which they could use to haul their men from the Tarrant facility to the job sites. Crane depo. at 18.

at 21. However, Nichols stated he told the plaintiff to get "one of the spare pick-ups out on the yard. I didn't specify. I just told him to get one of the spare pick-ups and carry it with him."[11] Nichols depo. at 59, 62-63. The plaintiff asserts he was told whatever Mike wanted was fine by him. Plaintiff depo. at 154. Nichols never told the plaintiff to talk to Crane. Nichols depo. at 59. Crane told the plaintiff he could use Crane's truck. Plaintiff depo. at 155; Crane depo. at 22-23. Crane states this left him with a truck with no working radio. Crane depo. at 22, 24-25, 33. Crane also states he did not have the authority to allow an employee to borrow a pickup, only Nichols had that authority. *Id.* at 17.

Some of the plaintiff's crew (his brother and sons) had ridden to work with him that morning. Plaintiff depo. at 168-169, 179. Vernon Sanders was also on the plaintiff's crew, but drove his own vehicle from his home to the Tarrant facility, where he left his vehicle and took the service truck to the job site. Sanders depo. at 14. He agreed that no one else on the crew used his own vehicle to get to the Tarrant facility, but rode with the plaintiff every day. Sanders depo. at 15, 27-28; N. Hill depo. at 16. The plaintiff was not responsible for getting his crew back and forth to work.[12] Sanders depo. at 33; Nichols depo. at 70. Norman Hill had his own car and could have driven it to the Tarrant facility that morning. N. Hill depo.

---

[11] According to Nichols, any time a foreman had to leave early, the defendant would let them use a spare pickup, if needed to get back to the Tarrant facility. Additionally, the crew had a service truck on the job site that people used to ride back and forth. Nichols depo. at 61.

[12] Nichols did state that they had always managed to get their employees home somehow, so the rest of the plaintiff's crew needing a ride was not an issue. Nichols depo. at 80.

at 32. However, the plaintiff never requested that he do this.[13] N. Hill depo. at 35-36. If the plaintiff had not told him he had a truck for them to use, Norman Hill would have taken his own car. *Id.* at 49.

At the time plaintiff was ready to leave the site, the Ford Ranger, the plaintiff's truck and the service truck were present. Plaintiff depo. at 176. According to plaintiff, Crane brought the Ranger to the site and told plaintiff he needed his truck back because McAnnally, the truck supervisor, was angry the plaintiff had Crane's truck. *Id.* at 177. *See also* Crane depo. at 23-24. The Ford Ranger did not have a working two way radio. Plaintiff depo. at 178. The plaintiff told McAnnally that Nichols had approved the situation and McAnnally responded he "didn't give a damn, he wanted the truck back." *Id.* at 178. Crane left with his truck, leaving the Ford Ranger at the site. Crane depo. at 24-25; Sanders depo. at 23-24. According to Nichols, Crane needed the truck with the working radio. Nichols depo. at 66-67.

Thus, the plaintiff had his sons take the Ranger back. When they returned, about 3:00 p.m., they all went home.[14] Plaintiff depo. at 179, 185. The plaintiff never asked Crane to help him get his crew home. *Id.* at 180. The plaintiff's sons and brother rode home with him. Plaintiff depo. at 185; N. Hill depo. at 13. The other crew members took the water

---

[13]Interestingly, Norman Hill testified in his deposition that the plaintiff told him on the way home the night before he left early that he had another truck. N. Hill depo. at 35. This would have been before the plaintiff asked Nichols if he could use a second truck the morning of July 9.

[14]According to Sanders, they quit working at exactly 2:23 p.m. He remembers this specific time because the plaintiff told him to remember it. Sanders depo. at 21. *See also* depo. at N. Hill at 16.

truck back to the Tarrant facility. Plaintiff depo. at 186. The crew had planned to stay and work after the plaintiff left. N. Hill depo. at 39.

The following morning, when plaintiff got to work, he was fired by Nichols for the manner in which he handled the situation. Plaintiff depo at 188, 192, 195; N. Hill depo. at 8. The plaintiff alleges he may have told Nichols on July 9 that if he could not arrange to have a truck at the site for his crew, they would have to leave with him. Plaintiff depo at. 213, 240-241. The plaintiff never reported in that he was leaving early with his entire crew. *Id.* The plaintiff states he had the authority to leave with his crew at any time he wanted. *Id.* at 248. Nichols related that he told Gossett "Ronnie had left the job early with his whole crew and I expected that job to be finished, that I had trucks and quarry set up to dump set up (sic) Saturday morning. And it was not finished. And I didn't like it. And I was going to terminate him." Nichols depo. at 52-53, 76; Gossett depo. at 27-29. The plaintiff had never done this before. Nichols depo. at 53. Nichols stated he did not give the plaintiff permission to leave the job undone. *Id.* at 74. Nichols also stated that the plaintiff should have called either him or Ratliff and checked before leaving with his crew. *Id.* at 91. *See also* exhibit 15 to plaintiff's depo.

The plaintiff was aware that the job he was doing on July 9, 1999 involved a deadline and hoped to have the work finished the following day. Plaintiff depo. at 173-175, 189. He also asserts the job would have required another day and a half to finish it. *Id.* at 212. Sanders testified that the job could not be finished that day. Sanders depo. at 25-27, 45. Norman Hill, the plaintiff's brother, said about 4 or 5 hours worth of work remained. N. Hill

depo. at 40. Nichols stated that he sent Ratliff and another employee back to that site and they finished subgrading it that afternoon (July 9) in four or five hours. Nichols depo. at 74, 77, 79.

The plaintiff asserts that Nichols refused to honor his four hour work restriction, although plaintiff explains that after discussing this restriction with Nichols, they agreed that a four hour work day was not worth plaintiff coming to work. Plaintiff depo. at 207-208; Nichols depo. at 38, 41. The plaintiff alleges Nichols made him perform tasks that were more strenuous than those performed before he was off work for his back injury. Plaintiff depo. at 210. However, plaintiff then clarifies that his duties were the same upon his return. *Id*. at 210-211. *See also* Sanders depo. at 16-17; N. Hill depo. at 20. However, he only ran the motor grader about eight hours a day, and then his brother would run it. Sanders depo. at 17-18; Nichols depo. at 47.

The plaintiff argues that he was fired in retaliation for his 1996 Worker's Compensation claim. *See* plaintiff depo. at 204-205. The plaintiff admits he did not return to work while under restrictions, but argues his restrictions were not honored by defendant. *Id*. at 209, plaintiff's memorandum at 4. Nichols states that he did not know the plaintiff had any restrictions and that the plaintiff never complained his restrictions were not being honored. Nichols depo. at 50. Norman Hill states he believed the plaintiff was fired for not being able to do his job based on him hurting all of the time. N. Hill depo. at 29. Nichols states he did not think the plaintiff was limited with respect to his duties as a foreman up until the date he was fired. Nichols depo at 28.

### III. STANDARD FOR EVALUATING A SUMMARY JUDGMENT MOTION

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23. The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of genuine issues of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324, Fed. R. Civ. Pro. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson*, 477 U.S. at 249.

"The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case .... A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AL Transport*, 229 F.3d 1012, 1023 (11th Cir.2000), quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995). A factual dispute regarding a non-material issue will not preclude the defendant from succeeding on a motion for summary judgment. *Brown v. American Honda Motor Co.*, 939 F.2d 946, 953 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). All "reasonable doubts" about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). However, all "doubts" need not be so resolved. *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987).

## IV. DISCUSSION

### A. ADA CLAIM

The ADA provides that no covered employer shall discriminate against a "qualified individual with a disability because of the disability of such individual with regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, the plaintiff must show

11

that (1) he has a disability; (2) he is a qualified individual "which is to say, able to perform the essential functions of the employment position that he holds ... with or without reasonable accommodations; and (3) he was discriminated against because of the disability. *Reed v. Heil Co.*, 206 F.3d 1055, 1061 (11th Cir.2000); *citing Hillburn v. Murata Electronics North America, Inc.*, 181 F.3d 1220, 1226 (11th Cir.1999). In addition, the plaintiff must show that the employer had either actual or constructive knowledge of the disability or considered the employee to be disabled. *Morisky v. Broward County*, 80 F.3d 445, 448 (11th Cir.1996).

The defendant argues that even if the plaintiff's back injury was a disability under the ADA, which the defendant disputes, he was not terminated for it. The court notes that all of the evidence before it is that the plaintiff was able to get his job done. Additionally, the court finds that the plaintiff cannot establish that he was "disabled" as that term is defined by the ADA at the time he was terminated. Without meeting such definition, the plaintiff is necessarily precluded from establishing that he was wrongfully terminated due to a disability in violation of the ADA.

The ADA defines disability as: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; or (B) a record of such an impairment or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2). The United States Supreme Court has fashioned a three part analysis for consideration of a claim under subsection (A), above: (1) whether the plaintiff had a physical impairment; (2) identification of the life activity upon which plaintiff relies and determining whether it

constitutes a major life activity under the ADA; and (3) whether the impairment substantially limits the major life activity. *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 2202, 141 L.Ed.2d 540 (1998). Thus, to establish a prima facie case and survive summary judgment, the plaintiff must present sufficient evidence to create a genuine issue of material fact as to whether his physical impairments substantially limit his ability to partake in a major life activity. *Id.; see also Swain*, 146 F.3d at 857.

The EEOC defines major life activity as, "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (1996). "Substantially limited" is defined by the EEOC for ADA purposes to mean:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1)(1996). In deciding whether a major life activity has been substantially limited, the EEOC provides several factors to consider:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2)(1996); *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996).

The plaintiff does not identify any major life activity from which he was limited by reason of the injury to his back at the time he was fired.[15] The plaintiff's release to full duty by his doctor on June 14, 1999 contradicts any suggestion that he was limited from the life activity of working. *Chandra v. Englehard/ICC*, 234 F.3d 1219, 1223 (11th Cir. 2000). The plaintiff's own testimony does not support such a suggestion either as he states, under oath, that he was able to perform his job until the day he was fired. Plaintiff depo. at 106, 114.

In spite of arguing that his restrictions were not honored, the plaintiff offers no evidence that he requested the defendant to modify or adjust his job duties. *See Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir.1999). The plaintiff received disability pay until he returned to work without restrictions. The plaintiff alleges the defendant made him perform more strenuous work, but offers no evidence of this, including plaintiff's own testimony.

The plaintiff has not submitted any evidence to show that he was more restricted in his abilities to work than the average person in the population, or that he had any restrictions at all from his back injury through the date he was terminated. *See Maynard v. Pneumatic Products Corp.*, 233 F.3d 1344, 1347-48 (11th Cir.2000); *Swain*, 146 F.3d at 857 ("The term 'substantially limited' means significantly restricted in the ability to perform either a class

---

[15] The plaintiff makes vague allegations that he was limited in his ability to walk and sit and possibly work. Plaintiff's memorandum at 16. Such limitations do not appear in any substantive pleading by the plaintiff. Furthermore, the plaintiff offered no evidence of such limitations as required by the above analysis. For example, on the date he was terminated, the plaintiff had previously been released to work with no limitations on his walking, sitting, or working. *See* defendant Exhibit 8. *See also* defendant Exhibit 5, a physical evaluation noting that the plaintiff has no limitations on his abilities to walk or stand, and is limited in sitting by the requirement that he stand up for four or five minutes every hour.

of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities"). Because the plaintiff has failed to produce any evidence at all that he was limited by an impairment at the time he was terminated, the court is unable to find any "major life activity" to be limited.

Because of the plaintiff's failure to establish that either (1) he has a physical or mental impairment that substantially limits a major life activity or (2) the record of such impairment or (3) being regarded as having such an impairment, the plaintiff has failed to establish that he was discriminated against because of a disability. *See e.g. Hillburn*, 181 F.3d at 1226-27 (to constitute a disability, the plaintiff must show a physical impairment which substantially limits one or more major life activity); *see also Swain,* 146 F.3d at 857. The plaintiff's proof, at most, is that he became unable to work due to a pre-existing back injury on or after July 10, 1999. Although the defendant had a back injury at the time of his termination, this, standing alone, is not necessarily a disability as contemplated by the ADA. *Chandra,* 234 F.3d at 1222 (11th Cir.2000). Similarly, not every disability entitles an individual to the protections of the ADA. *Hillburn*, 181 F.3d at 1227; *Gordon*, 100 F.3d at 911.

The plaintiff cited no evidence to support any contention that he was regarded by the defendant as having a disability. Similarly, the court finds no evidence that the defendant regarded the plaintiff as having a significant impairment. The plaintiff has not alleged that his ability to work was limited to an extent greater than the average person in the population and has failed to show he was in any way limited from performing his job, or any other job

15

at the time he was terminated. As such, he cannot be considered disabled for purposes of protection under the ADA.[16]

The plaintiff argues that his termination was pretextual, but has not shown that a "non-disabled" employee would not have been terminated for allowing his crew to abandon a work site. *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1185 (11th Cir.1984). While the plaintiff states other employees were not disciplined for other acts, none of the employees to whom plaintiff points committed a similar act. *See* plaintiff depo. at 224-233.

### B. WORKER'S COMPENSATION RETALIATION CLAIM

The plaintiff also alleges that his discharge was retaliation for his 1996 Worker's Compensation claim, in violation of § 25-5-11.1, Alabama Code 1975, as amended. The defendant argues that the plaintiff is collaterally estopped from relitigating this issue because he was found to have engaged in misconduct causing his termination in his unemployment compensation hearing. The defendant argues that the determination from an unemployment compensation hearing that the plaintiff was discharged for misconduct collaterally estops the

---

[16] The other end of the spectrum also applies to the plaintiff's claim. In addition to presenting no evidence that he was under any disability before July 10, 1999, he has presented no evidence that he could perform any job with or without reasonable accommodations after that date. The plaintiff represented on his Social Security application that he became totally disabled as of that date. The plaintiff is estopped from denying the truth of that statement in this litigation. *See Talavera v. School Board of Palm Beach County,* 129 F.3d 1214, 1219-1220 (11th Cir. 1997) ("Where ... the party opposing summary judgment has made sworn statements attesting to [his] total disability and has actually received payments as a result of [his] condition, the courts should carefully scrutinize the evidence [he] marshals in an attempt to show [he] is covered by the ADA. The burden faced by ADA claimants in this position is, by their own making, particularly cumbersome, for summary judgment should issue unless there is strong countervailing evidence....").

16

plaintiff's assertion in a Worker's Compensation retaliation claim that the Worker's Compensation claim was the sole reason for the termination. *See Wal-Mart Stores, Inc. v. Smitherman*, 743 So.2d 442 (Ala. 1999). The court finds this case to be instructive. Like the facts before this court, the plaintiff in Smitherman was discharged after an on the job injury. She filed a claim for unemployment compensation benefits and was found to be partially disqualified under § 25-4-78(3)(c), Alabama Code. The plaintiff appealed and the appeals referee affirmed the decision of the examiner. Like the plaintiff before this court, she never appealed the decision to circuit court for a trial de novo. *Smitherman*, 743 So.2d at 443-444. The court in *Smitherman* noted:

> In order for the doctrine of collateral estoppel to apply to an issue raised in an administrative proceeding, the following elements must be present:
>
> "(1) there is an identity of the parties or their privies; (2) there is identity of issues; (3) the parties had an adequate opportunity to litigate the issues in the administrative proceeding; (4) the issues to be estopped were actually litigated and determined in the administrative proceeding; and (5) the findings on the issues to be estopped were necessary to the administrative decision.

*Smitherman*, 743 So.2d at 445; citing *Ex parte Smith*, 683 So.2d 431, 433 (Ala. 1996).

To be eligible for benefits under § 25-4-77(a), Ala.Code, the plaintiff must, among other things, be able to work and be available to work. Under § 25-4-78(3)(c), Ala.Code, an unemployment compensation claimant is partially disqualified for receiving benefits if he was discharged for benefits in connection with work. In the facts before this court, the defendant has asserted that the plaintiff was terminated for allowing his crew to abandon a job site. The plaintiff therefore bore the burden in his unemployment compensation claim

of establishing that he was not discharged for misconduct but solely for seeking workers' compensation benefits. He bears the same burden before this court. *Smitherman,* 743 So.2d at 445-446. *See* § 25-1-11.1, Ala.Code; *Kent Corp. v. Hale,* 699 So.2d 954, 958 (Ala. 1997). Thus, the first element of collateral estoppel, an identity of parties, is satisfied. For the same reasons, the second element, an identity of issues (whether the plaintiff engaged in misconduct) is also satisfied.

The plaintiff had an adequate opportunity to litigate the reason for his discharge before the appeals referee. The plaintiff had the right to representation, to subpoena records and the attendance of witnesses and present evidence before the appeals referee. *See* generally §§ 25-4-92(b), 25-4-93, Ala.Code. The opinion of the appeals referee resulting from this hearing is in the record before this court. *See* plaintiff Exhibit 12. Thus, this court finds that the plaintiff had an adequate opportunity to litigate the reason for his discharge. Further, this issue was actually litigated in the administrative proceeding, and in fact it was the core issue in his administrative proceeding. As such, this court finds that the fourth element for collateral estoppel is satisfied. For the same reason just stated, this court notes that the findings as to the reason for the plaintiff's discharge was absolutely necessary to the administrative proceeding and hence the fifth and final element for collateral estoppel is met.

Considering the foregoing analysis, the court finds that the plaintiff here is collaterally estopped from relitigating whether or not his termination was for misconduct connected with his employment for purposes of his retaliation claim. The plaintiff is stuck with the finding

that he was terminated for misconduct. Hence, this court is barred from a finding that the plaintiff's 1996 worker's compensation claim is the sole reason for his termination.[17]

## V. CONCLUSION

In consideration of the foregoing, the court finding no evidence that the plaintiff was suffering from a disability at the time of his termination, and no evidence that the plaintiff was terminated for seeking worker's compensation benefits, the court can find no genuine issue of material fact left for trial. As such, defendant's motion for summary judgment be and hereby is **GRANTED**. This case is **DISMISSED WITH PREJUDICE**.

**DONE** and **ORDERED** this the ___12___ day of June, 2001.

INGE P. JOHNSON<br>
UNITED STATES DISTRICT JUDGE

---

[17]The court notes that the plaintiff claims he was terminated for having a disability, but also claims he could perform his job with or without accommodation. He claims he was terminated *solely* for filing a worker's compensation claim three years earlier, which would necessarily preclude termination for disability discrimination under the ADA. He has represented that he was ready, willing and able to work on July 10, 1999 in his unemployment compensation claim, was completely disabled from working as of July 10, 1999 in his Social Security claim, and that he could perform his specific job with defendant with or without accommodation on that date in his ADA claim.